**Beverly A. WALTER, a/k/a Beverly A. Schanilec, Plaintiff,**

v.

**KFGO RADIO, a Subsidiary or property of Communication Property, and Richard Voight, Defendants.**

No. A3–80–20.

United States District Court, D. North Dakota, Southeastern Division.

Aug. 4, 1981.

Herschel Lashkowitz, Fargo, N. D., for plaintiff.

H. Patrick Weir and Douglas R. Herman, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, N. D., for defendants.

## MEMORANDUM OF DECISION AND ORDER FOR JUDGMENT

BENSON, Chief Judge.

Plaintiff in this action, Beverly Walter, alleges she was wrongfully discharged from her employment by defendants KFGO Radio and Richard Voight, general manager of KFGO. Plaintiff contends her discharge was based on age and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17 and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 (ADEA). Plaintiff seeks compensation for loss of earnings and benefits due to alleged wrongfully denied promotions, back pay with interest, reinstatement, injunctive relief, and attorney fees and costs.[1] Defendants deny the allegations. Jurisdiction is based on 28 U.S.C. § 1331. The case was tried to the court.

## FINDINGS OF FACT

Plaintiff was born in Oakes, North Dakota on March 8, 1934. She graduated from Oakes High School in 1951 and held various jobs until she was hired by the local radio station in 1959. While working for the Oakes station, plaintiff became involved in all facets of radio work including sales, production, copy writing, farm and general programming, and broadcasting.

Plaintiff left the Oakes station and joined KFGO (then called KXGO) in 1965 as Continuity Director. In that position, plaintiff continued to work in sales and copy writing. Additionally, plaintiff co-hosted a radio talk show, Wide Wide World, which aired from 8:30 a. m. until 10:00 a. m., Monday through Friday. Duties relating to Wide Wide World included producing the show, setting up guest interviews, talking with listeners who phoned in, answering listener mail, and selling commercial time for the program. The show, which was later called the Odd Couple show, was primarily a talk show including household hints, recipes, guests and listener participation in its format. At some point, the show was limited to a one hour time slot from 9:00 a. m. to 10:00 a. m.

In October of 1969, plaintiff took on additional duties as KFGO Farm Director. KFGO's farm programming at that time was loosely structured. Plaintiff initiated a number of additions to the farm program, including county agent reports, market reports, and local stockyard reports. The position required plaintiff to be on the air at 6:00 a. m. Plaintiff thus worked from about 5:30 a. m. until 1:00 or 2:00 p. m. and often put in hours beyond these times. She

---

1. This court, by order dated August 21, 1980, disallowed plaintiff's claim for damages due to impairment of employability and resulting from illness incurred because of the alleged wrongful discharge and accompanying stress.

also continued her other work at the station.

In 1973, at the request of his employer, Communication Property, Inc. which had recently acquired KFGO, Richard Voight joined KFGO as general manager. Voight has remained general manager to date. As general manager, Voight oversees and supervises the day to day operation of the station and is the top officer in the KFGO hierarchy. When Voight joined KFGO, it was a low budget station with a skeleton staff of fourteen employees. KFGO had no program director, no sales manager and only one news person. KFGO lost money in 1969 and 1970 and when Voight joined the staff in 1973, it was the least profitable of three stations owned by Communications Property, Inc. In his position as general manager, Voight was plaintiff's supervisor.

During late 1973 or early 1974, Voight learned via a rating service known as the Doane Survey[2] that KFGO's farm programs had a much smaller listenership among farmers than did the rival station, WDAY. WDAY used the survey results in a sales brochure which graphically demonstrated that WDAY had four to six times the listenership of KFGO during the hours of 6:30 a. m. to 8:00 a. m., when farm programming is typically offered. The brochure also stated that 41% of farmers rated WDAY first in providing the most useful and reliable farm markets and news. KFGO rated 16.7% in this category. These survey results prompted KFGO to revamp its farm programming. In March of 1975, KFGO hired Ron Torkelson in a co-farm director capacity. Torkelson had a master's degree in agronomy, was a recognized sugar beet specialist, and was respected by farmers and persons involved in agriculture. He was hired to provide technical expertise to the farm programming. After negotiations as to salary, Torkelson joined KFGO at a $19,000 annual salary. Plaintiff, as co-farm director, was paid $12,000 in 1975.

Torkelson left KFGO in December of 1975. Plaintiff acted as sole farm director until Larry Ristvedt joined KFGO in April of 1976. Ristvedt received a $13,000 annual salary for 1976, as did plaintiff. Ristvedt had a degree in economics and marketing and experience with commodities futures markets. Ristvedt worked from 5:30 a. m. to 1:00 or 2:00 p. m. and returned to the station at 4:30 p. m. for another hour. In September of 1976 plaintiff resigned as co-farm director and became Public Relations Director for KFGO.

Plaintiff received no formal job description, but was told to keep on doing what she had been doing, including continuing her duties connected with the Odd Couple show. The public relations job primarily required plaintiff to act as a liaison between the station and the public.

In 1977, the Arbitron Radio Service, a rating service which surveyed the general listening audience, revealed that in the April-May survey period, at the 9:00 a. m. to 10:00 a. m. Odd Couple time slot, WDAY had 37.4% of the listening audience while KFGO had only 23.2%. In April-May of 1978, during this same time slot, WDAY had 30.3% of the listenership, while KFGO had 29.1%. This was the only hour in which KFGO had fewer listeners than WDAY. In July of 1978, the Odd Couple show was cancelled. Plaintiff was then offered a newly created position as Promotions Director. The position required promoting KFGO throughout the listening area, as well as some travel and weekend work. After much discussion and deliberation, plaintiff did not accept the position, which was never filled. Plaintiff took the month of September off. In October she returned to the station, but had no specified job. Voight offered plaintiff four to six weeks of severance pay and suggested she look for a job elsewhere. Plaintiff, who was then 44 years old, left the station in October. She looked for other work, but found nothing similar in nature. Plaintiff has remained unemployed since October of 1978.

**2.** The Doane Survey is a market area survey authorized by the National Association of Farm Broadcasters to determine farm radio listening habits of farm operators. *See, e. g.,* 1974 Farm Broadcast Media Study, Introduction, prepared by Doane Agricultural Service, Inc.

## APPLICABLE LAW

 The recent case entitled *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) holds that a plaintiff in a Title VII case bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Id.* at 251, 101 S.Ct. at 1093. If a prima facie case is proven, the burden shifts to defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." *Id.* quoting *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Should defendant carry this burden, plaintiff then must prove by a preponderance of the evidence that the reason offered by defendant was not the true reason, but merely a pretext for discrimination. 450 U.S. at 251, 101 S.Ct. at 1093. The burden of persuasion never shifts, but remains at all times with plaintiff. *Id.*

This analysis holds true for age discrimination cases as well as sex discrimination cases. *See Cova v. Coca-Cola Bottling Company of St. Louis*, 574 F.2d 958, 959–60 (8th Cir. 1978). *See also Sutton v. Atlantic Richfield Company*, 646 F.2d 407, 411 (9th Cir. 1981) and cases cited therein. This is because the purpose of the ADEA and Title VII are the same, to eliminate arbitrary discrimination in the workplace. As the Supreme Court has stated, "the prohibitions of the ADEA were derived *in haec verba* from Title VII." *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). *Compare* 42 U.S.C. § 2000e–2(a)(2) *with* 29 U.S.C. § 623(a)(2). Bearing this standard of proof and burden of persuasion in mind, the court will examine each of plaintiff's theories of recovery.

## I. AGE DISCRIMINATION

 To establish a prima facie case of violation of the ADEA, plaintiff must show 1) she is within a protected age group, 2) she has met applicable job qualifications, 3) despite these qualifications, she was discharged, and 4) after the discharge, the position remained open and the employer continued to seek applications from persons with similar qualifications. *Cova, supra* at 959. These factors permit an inference of discrimination because, when proved, they show rejection was not based on either of the "two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866 n.44, 52 L.Ed.2d 396 (1977).

 At the time of her departure from KFGO in October of 1978, plaintiff was 44 years old. She was therefore within the protected age group of persons between the ages of 40 and 70. 29 U.S.C. § 631(a). Plaintiff was also well qualified for the position of Promotions Director which was offered to her. A number of witnesses in the broadcasting field testified to her favorable reputation, professionalism, and ability to relate well to the public. As to plaintiff's discharge from the position, it is more correct to state that plaintiff did not accept the replacement position offered to her. Though plaintiff contends she was constructively discharged from her position with the station, the facts do not support this theory. Constructive discharge arises "only when a reasonable person would find conditions intolerable." *Johnson v. Bunny Bread Company*, 646 F.2d 1250, 1256 (8th Cir. 1981). Conditions at KFGO were not intolerable under any view of the evidence presented.

Even assuming plaintiff was constructively discharged, she has failed to establish the position remained open and was filled by another. Instead, plaintiff has established that defendant created a position for her which she rejected. This position was not filled by some other person. No inference of discrimination arises where there is no position to be filled. Nor is management at fault for its failure to create some other position for plaintiff in order to keep her on the payroll. *See generally Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914 (2d Cir. 1981). In the case at bar, management made an earnest attempt to accommodate

plaintiff after its cancellation of the Odd Couple show. The cancellation decision was a legitimate decision based on the show's unsatisfactory ratings and a perceived need to try something different in that time slot. The ADEA was not intended to " 'diminish management prerogatives.' " *Burdine supra* at 257, 101 S.Ct. at 1096 (referring to Title VII) quoting *United Steelworkers of America v. Weber*, 443 U.S. 193, 207, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979). Quite simply, an employer may make a subjective judgment to discharge an employee for any reason that is not discriminatory. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 n.6. (1st Cir. 1979).

■ Though plaintiff failed to prove the "traditional" prima facie case of age discrimination, *McDonnell Douglas* states that all cases will not fit into this structure. 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13. A more flexible approach may need to be devised. The ultimate burden that plaintiff must bear requires proof that age "was a determining factor in . . . her discharge." *Cleverly v. Western Electric Company*, 594 F.2d 638, 641 (8th Cir. 1979) (per curiam). This proof may be established by direct evidence, *e. g.*, employer tells plaintiff she is too old for the job; statistical evidence demonstrating a pattern of unwarranted discharges of older employees, (*See Taylor v. Teletype Corp.*, 648 F.2d 1129 (8th Cir. 1981); *Heagney v. University of Washington*, 642 F.2d 1157 (9th Cir. 1981); *Laugesen v. Anaconda Company*, 510 F.2d 307, 317 (6th Cir. 1975) citing *McDonnell Douglas, supra*); or other circumstantial evidence indicating a preference for younger employees. *See generally Stanojev supra* at 921, *Loeb supra* at 1017.

Plaintiff failed to adduce such evidence. The evidence did show that while defendant discharged at least three persons over 40 (including plaintiff, a 61 year old male engineer, and plaintiff's 46 year old Odd Couple co-host), it discharged at least nine persons under 40. KFGO has also hired at least three people over 40. The very nature of the entertainment business dictates a relatively large employee turnover as part and parcel of a station's quest to reach the top of the ratings and once there to remain there. Plaintiff's claim of wrongful discharge due to age discrimination is without merit.

## II. SEX DISCRIMINATION

Title VII of the Civil Rights Act of 1964, as amended at 42 U.S.C. § 2000e–2 states in pertinent part as follows:

> (a) It shall be an unlawful employment practice for an employer—
>
> > (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . .

42 U.S.C. § 2000e–2(a)(1).

Plaintiff alleges she was discriminated against on the basis of her sex in relation to the compensation she received and the terms and conditions of her employment. These allegations are addressed below.

### A. Sexual Harassment.

■ Plaintiff introduced evidence at trial of certain inappropriate behavior on the part of her immediate supervisor, Richard Voight. This alleged behavior included Voight's patting plaintiff on the bottom, touching plaintiff in the breast area, and making an inebriated attempt, in 1974, to have an affair with plaintiff in her Kansas City motel room when both were attending a Farm Bureau Convention. Defendant Voight acknowledges the bottom patting incidents, stating they occurred rarely (three to five such incidents from 1973 to 1978), always in the presence of others, and were not sexually oriented, but intended as a show of support and encouragement when plaintiff expressed a lack of confidence in herself and her ability. Voight denies the alleged breast area touching and the alleged Kansas City incident. The court need not decide which party has the more accurate recollection of these alleged occurrences. Even assuming these incidents all occurred, they are simply insufficient to es-

tablish a prima facie case of sexual harassment.

Sexual harassment is generally accepted as a cause of action under Title VII, though the elements of a prima facie case are not firmly settled. *See Tomkins v. Public Service Electric & Gas Co.*, 568 F.2d 1044 (3d Cir. 1977); *Barnes v. Costle*, 561 F.2d 983 (D.C.Cir.1977); *Garber v. Saxon Business Products, Inc.*, 552 F.2d 1032 (4th Cir. 1977) (per curiam); *Heelan v. Johns-Manville Corp.*, 451 F.Supp. 1382 (D.Colo.1978); *Munford v. James T. Barnes & Co.*, 441 F.Supp. 459 (E.D.Mich.1977); *Miller v. Bank of America*, 418 F.Supp. 233 (N.D.Cal.1976), *rev'd and remanded*, 600 F.2d 211 (9th Cir. 1979); *Williams v. Saxbe*, 413 F.Supp. 654 (D.D.C.1976), *rev'd sub nom on other grounds and remanded, Williams v. Bell*, 587 F.2d 1240 (D.C.Cir.1978). *See also, Corne v. Bausch & Lomb, Inc.*, 390 F.Supp. 161 (D.Ariz.1975) (holding sexual harassment is not a cause of action under Title VII), *vacated and remanded*, 562 F.2d 55 (9th Cir. 1977). *See generally* Annotation 46 ALR Fed. 224 (1980).

The Equal Employment Opportunity Commission recognizes sexual harassment as a cause of action and has promulgated standards to consider in a sexual harassment case. As these guidelines are administrative interpretations set forth by the enforcing agency, they are entitled to great deference. *Albermale Paper Company v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Company*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971). These guidelines state in pertinent part as follows:

(a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

(b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

29 C.F.R. § 1604.11(a)(b) (1980) (footnote omitted).

The guidelines initially focus on whether the unwarranted sexually oriented conduct was a "term or condition" of employment and thus violative of Title VII as amended. *See also Tomkins supra* at 1046; *Heelan supra* at 1389. In this context, the words "term or condition" may be construed to mean that management decisions as to plaintiff's salary, benefits, promotions,[3] and employment were ultimately conditioned on plaintiff's response to management's sexual overtures. *See, e. g., Tomkins supra* at 1046. Plaintiff has failed to prove such terms or conditions existed. *Cf. Williams v. Civiletti*, 487 F.Supp. 1387 (D.D.C.1980) (mem.).

During the time period when the above noted sexual overtures were made, plaintiff continued in her job, continued to retain and carry out job related duties and responsibilities, and apparently continued receiv-

---

**3.** Plaintiff stated at trial that she was overlooked for certain promotions that went to men. She had not requested management to consider her for these promotions, however. "The law does not require that an employer be a mind reader. If Plaintiff expected a transfer or promotion ... it was for her to make that desire known to the proper party." *Downey v. A. H. Belo Corporation*, 402 F.Supp. 1368, 1373 (N.D.Tex.1975).

ing raises.[4] Further, plaintiff received public praise from Voight; was featured in a 1975 brochure which included several pictures of plaintiff and described her as "extremely popular with her large following, which includes both rural and urban listeners, on and off the air;" and was promoted as a station personality in a 1976 billboard campaign. This evidence refutes the existence of any retaliatory actions arising from plaintiff's rebuff of defendant Voight in the alleged 1974 motel incident. Though plaintiff was understandably embarrassed by the bottom patting incidents, she never communicated her embarrassment to Voight. Viewing the circumstances as a whole, there is no evidence to demonstrate that Voight's conduct had the effect of substantially interfering with plaintiff's work performance or created an intimidating, hostile or offensive working environment. 29 C.F.R. § 1604.11 (1980). Plaintiff testified repeatedly that she loved her work, was totally loyal to KFGO, and would like to return to KFGO. It is apparent that plaintiff has *ex post facto* seized on these incidents in an attempt to gain reinstatement at KFGO as a broadcast personality. Plaintiff's claim of discrimination via sexual harassment is untenable.

### B. Equal Pay

Plaintiff alleges discrimination on the basis of sex because she was paid less than her co-farm directors, Ron Torkelson and Larry Ristvedt. The Equal Pay Act of 1963, 29 U.S.C. § 206(d) added to section 206 of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219 (as amended), the principle of equal pay for equal work regardless of sex. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 190, 94 S.Ct. 2223, 2226, 41 L.Ed.2d 1 (1974). The Act states in pertinent part as follows:

(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis

of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

The principle of the Act was incorporated in Title VII of the Civil Rights Act of 1964 at 42 U.S.C. § 2000e–2(h). *See County of Washington v. Gunther,* —— U.S. ——, ——, ——, 101 S.Ct. 2242, 2250, 2252, 68 L.Ed.2d 751 (1981). The exceptions to the equal pay provision were also incorporated through the Bennett Amendment, a "technical amendment" designed to resolve any potential conflict between Title VII and the Equal Pay Act. *Id.* at ——, 101 S.Ct. at 2248. The Bennett Amendment, which is the last sentence of 42 U.S.C. § 2000e–2(h), states as follows:

It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

42 U.S.C. § 2000e–2(h).

■ In examining a sex discrimination case involving unequal compensation, Title VII and the Equal Pay Act must be construed in harmony. *Orahood v. Board of Trustees,* 645 F.2d 651, 654 (8th Cir. 1981).

---

**4.** No evidence was presented as to plaintiff's salary and benefits except for the years of 1975

and 1976. She received a $1,000 raise in 1976.

■ In the context of plaintiff's allegations, a prima facie case of discrimination thus requires " 'showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under [Title VII]." ' " *Id.* at 656 quoting *Furnco Construction Corporation v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (quoting in part from *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

For purposes of plaintiff's claim, equal means substantially equal. The question is whether the performance of the jobs held by the co-farm directors required substantially equal skill, effort and responsibility under similar working conditions. 29 U.S.C. § 206(d)(1). The court must look to actual job requirements and performances rather than job titles. *Orahood supra* at 654, citing *Horner v. Mary Institute,* 613 F.2d 706, 713, 714 (8th Cir. 1980).

■ Again, plaintiff has failed to meet her burden of proof. In 1975, Ron Torkelson joined KFGO as co-farm director with plaintiff. Torkelson was hired at an annual salary of $19,000. He remained with KFGO for nine months, earning approximately $14,250. Plaintiff's salary in 1975 was $12,000, thus during the nine month period she earned $9,000. Clearly, there is a substantial disparity in salaries for the two positions, each titled co-farm director.

It is not clear, however, that the co-farm directors exerted substantially equal skill, effort and responsibility. The court received little specific information as to the actual work each director did. Torkelson stated he was hired primarily in a research capacity with a view to becoming sole farm director. The court can infer that Torkelson directed all his work effort to farm broadcasting while plaintiff handled other programming, notably the Odd Couple show, in addition to farm programming. Beyond this, the court cannot speculate as to the substance of the farm programming work done by Torkelson or plaintiff during this nine month period, nor can the court make a judgment as to the relative equality of the positions. The evidence was not presented.

Even assuming plaintiff met her burden of proof as to a prima facie case of discrimination, defendant successfully demonstrated the pay disparity was based, not on Torkelson's sex, but on 1) management's decision to affirmatively alter and improve KFGO's farm programming in view of the ratings as well as the need for more scientific and technological farming information, 2) Torkelson's educational background and hands-on farming experience, and 3) Torkelson's bottom line demand for $19,000. Torkelson's farm expertise is graphically set out in a brochure published by KFGO and aimed at attracting a larger share of the farm market and listenership. The brochure states the following concerning Torkelson's background:

> Ron comes to KFGO with a broad ag background. He was on the research staff in the Soil Department at North Dakota State University and also served as sugarbeet specialist for NDSU and the University of Minnesota. Ron is a member of the American Society of Agronomy; the American Society of Sugarbeet Technology; the No-Till Farmer Association; the Soil Science Society of America; and is on the North Dakota Governor's Committee on Migrant Labor. Ron also serves on the Agriculture Committee of the Moorhead Area Chamber of Commerce.
>
> A native of Black River Falls, Wis., Ron got his B.S. degree in Conservation of Natural Resources from Wisconsin State University in 1965 and received his M.S. degree in Agronomy from South Dakota State University in 1971.

In contrast, the brochure describes plaintiff as a voting member of the National Association of Farm Broadcasters and a member of the Advisory Council on Rural Communications at the University of Minnesota, Crookston. Torkelson's qualifications for farm director patently outweigh plaintiff's qualifications.

Additionally, this background accounts for Torkelson's demand for a salary of $19,000. Both Voight and Torkelson testified as to their negotiations concerning setting a salary. Torkelson was employed at the time he was hired by KFGO and felt he could command a similar salary elsewhere with his background and experience. KFGO agreed. Education and experience are relevant factors in determining a starting salary. *Herman v. Roosevelt Federal Savings & Loan Company*, 432 F.Supp. 843, 851 (E.D.Mo.1977), *aff'd*, 569 F.2d 1033 (8th Cir. 1978). Where defendant demonstrates that a higher salary is necessary to hire the person best able to do the job, that consideration is a valid differential based on a factor other than sex. *Horner supra* at 714. An employer may also consider the market place value of the skills of an individual when setting his salary. *Id.* Title VII is designed to eliminate discrimination, it does not require that unqualified persons be hired, retained, or promoted. *Saracini v. Missouri Pacific Railroad Company*, 431 F.Supp. 389, 392 (E.D.Ark.1977).

A somewhat similar situation exists in the case of Larry Ristvedt. Ristvedt, who had a college degree in economics and marketing, was hired as co-farm director in April of 1976. He worked with plaintiff until she resigned from the co-farm director position in September of 1976. No evidence was presented as to the duties of each during this time. The two were each paid an annual salary of $13,000. Though plaintiff alleges Ristvedt worked only part time, thus essentially receiving more money than she did, the facts do not bear this out. Plaintiff testified she worked from 5:30 a. m. to 1:30 or 2:00 p. m., Monday through Friday as co-farm director. Ristvedt testified he worked from 5:30 a. m. until 1:00 or 2:00 p. m. and returned at 4:30 p. m. for another hour. Based on this testimony, the court finds no basis in fact to support plaintiff's allegation as to unequal pay for equal work during the six month period when she worked as co-farm director with Ristvedt.

## CONCLUSION

Plaintiff has failed to prove that she was discriminated against on the basis of either her sex or her age. The actions of management in this case were clearly within its prerogatives.

IT IS ORDERED that judgment be entered dismissing plaintiff's complaint and cause of action.