Margaret **HOSEMANN**

v.

**TECHNICAL MATERIALS, INC.**

**Civ. A. No. 80–0482.**

United States District Court,
D. Rhode Island.

Dec. 1, 1982.

William Robinson, III, Edwards & Angell, Providence, R.I., for defendant.

Ernest Barone, Providence, R.I., for plaintiff.

## OPINION

SELYA, District Judge.

The plaintiff, Margaret Hosemann, sued Technical Materials, Inc. ("TMI"), claiming that the defendant discriminated against her on the basis of sex, in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[1] Plaintiff alleges that TMI discharged her from employment while failing to oust similarly situated male employees. Both parties have engaged in comprehensive pre-trial discovery. Upon the comple-

tion of discovery, each party then filed a motion for summary judgment. Following the submission of briefs, oral arguments on these cross-motions were heard by the Court on November 1, 1982. As no material facts appear to be in dispute, the Court finds summary judgment to be appropriate in this case. *Cartagena v. Secretary of the Navy,* 618 F.2d 130, 137 (1st Cir.1980).

### I. Factual Background

Ms. Hosemann began working at TMI on November 27, 1978.[2] She was hired as a "brusher" at an hourly wage of $3.50 for a sixty day probationary period. Upon the completion of plaintiff's training, her hourly wage was increased to $3.75. In the spring of 1979, TMI supervisors John Pereira and David Sigman, and the TMI personnel manager, Eileen Morrow, jointly decided that the TMI laboratory staff was in need of augmentation and elected to add an additional staff member, thereby increasing the laboratory complement from three to four persons. Ms. Hosemann was transferred to this newly-created position on April 10, 1979. Sigman was her immediate supervisor in the laboratory. Although Ms. Hosemann received no pay increase for her work in the laboratory, she apparently perceived her transfer as a promotion, and professedly enjoyed her new work.

On Saturday, April 28, 1979, approximately three weeks after plaintiff began her duties as a laboratory trainee, she in-

---

1. 42 U.S.C. § 2000e–2 provides, in material part:

   It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

2. Unless otherwise noted, the source of the facts relied on is the Plaintiff's "Combined Statement of Undisputed Facts or Facts That Raise a Genuine Issue," filed with this Court on August 10, 1982. By stipulation entered September 2, 1982, the parties agreed that the foregoing statement constituted plaintiff's "concise statement of all material facts as to which [s]he contends there is no genuine issue necessary to be litigated," as required by Local

Rule 12.1(a)(1) of this Court. On August 30, 1982, defendant filed a statement pursuant to Local Rule 12.1(a)(2), which in substance requires a statement of material facts purporting to raise genuine issues which must necessarily be litigated. The latter statement essentially agreed with the plaintiff's statement of material facts except for some trivial distinctions. The Court finds these minor differences to be of no import to the instant decision once Occam's Razor is, as it must be, applied to the issues sub judice. To the extent that the facts asserted by the parties conflict (if at all), the Court will view the record in the light most favorable to the non-moving party. *See Thyssen Plastik Anger KG v. Induplas, Inc.,* 576 F.2d 400, 401 (1st Cir.1978); *Robinson v. Providence College,* No. 78–0327, slip op. at n. 3 (D.R.I. November 10, 1981).

jured her leg in a non-work-connected motorcycle accident. Although no fractures were sustained, the injury caused tenderness and swelling to Ms. Hosemann's knee and ankle. On the following work day (Monday, April 30, 1979), plaintiff went to TMI's offices and discussed her injuries with Sigman. She told him that her knee and ankle hurt so badly that she could hardly walk. Sigman asked Ms. Hosemann to try to return to work the following day, and Ms. Hosemann replied that she would make the effort.

The next morning, however, the plaintiff called the switchboard at TMI and left a message that she would not be able to work that day. Deposition of Margaret Hosemann, October 3, 1980, at 31 ("Deposition"). Later that same day, Sigman returned Ms. Hosemann's call. He described the purpose of this call as follows:

"I telephoned her and attempted to find out the nature and extent of her injuries and the date when she expected to be able to return to work. I explained to the plaintiff that I needed this information in order to arrange adequate coverage in the lab and would have to replace her in the lab . . . if she could not give me that information."

Affidavit of David Sigman, dated July 2, 1982 ("Sigman Affidavit"), at ¶ 5. Ms. Hosemann admitted in substance that this conversation took place; she testified that, during this exchange, Sigman offered to hold available for her, until such time as her health permitted her to resume work, a position as an inspector at TMI. Deposition

at 34. Plaintiff testified that she regarded the inspector's job as a "lower job" and surmised that it must have paid "less money". *Id.* at 34. She told Sigman that she was not interested in the inspection position.[3] In any event, TMI did not immediately fill the laboratory slot, but continued with commendable patience to await Ms. Hosemann's anticipated recuperation.

Thereafter, Sigman telephoned Ms. Hosemann almost every day for the next two weeks in a continuing attempt to determine when she would return to work. These discussions proved remarkably uninformative. Plaintiff did, however, give Sigman the name, address and telephone number of the physician who was treating her for the injuries. Sigman endeavored to contact this doctor, but was only able to speak with a nurse, who could not or would not give him any information.

Approximately two weeks after Ms. Hosemann's injury, Ms. Morrow, the personnel manager at TMI, telephoned the plaintiff to find out how she was feeling and when she would be returning to work. Ms. Hosemann told Ms. Morrow that she still did not know when she might be able to resume her employment, but that she would have some definite information on this subject in the near future, after her "next" visit to her physician.[4] Although Ms. Hosemann visited two different doctors several times during this period,[5] she admits that she did not ask either doctor when she could return to work. Deposition at 36, 43–44. Her promise to furnish an end-of-disability estimate after her "next" doctor's visit proved to be

---

**3.** In fact, inspectors received a higher hourly wage than laboratory workers. The pay scale for inspectors was $4.49 to $6.10 an hour compared to $4.31 to $5.80 an hour for laboratory workers. Answer to Interrogatory No. 11, Defendant's Answers to Interrogatories, filed as Exhibit D to plaintiff's motion for summary judgment ("Exhibit D"). There is no evidence in the record that plaintiff ever asked anyone at TMI what the hourly rate or salary scale was for inspectors; nor that she bothered, by inquiry to Sigman or elsewise, to ascertain any other pertinent information as to the offer of alternative employment.

**4.** Answer to Interrogatory No. 4, Exhibit D, states that Ms. Hosemann "promised she would have some definite information by Wednesday, May 23, 1979, when she returned from the doctor."

**5.** Plaintiff was treated by Dr. Baxter on May 4, May 14, May 23, June 6 and June 18, 1979. She was treated by Dr. Hillegass on May 2 and June 5, 1979. Exhibits H and I to plaintiff's motion for summary judgment.

as empty as Mother Hubbard's storied cupboard.[6]

The plaintiff did not call either Sigman or Ms. Morrow again until the end of May, when she contacted the latter.[7] The record is uncertain as to whether this call took place on May 30, 1979 or on May 31, 1979, but the exact date is irrelevant, as the parties agree that the call was in fact made and received. During that discussion, Ms. Hosemann asked Ms. Morrow if there would be a job waiting for her when she returned. Ms. Morrow told the plaintiff that she would be terminated from her employment at TMI because she had been absent from work and had not furnished TMI with any information as to when she would be able to return. Ms. Hosemann also was informed that she would be furnished a letter to that effect. Deposition at 48.[8] Ms. Hosemann did not, even at that time, offer any estimated return date. She did, however, complain that she was being treated unfairly; but she did not tell Ms. Morrow, nor otherwise intimate, that she was being treated unfairly because of her gender. Deposition at 50.

The letter Ms. Hosemann received was dated May 31, 1979, and stated, in pertinent part:

As of this date we find it necessary to terminate you from employment at TMI. Because of your extended illness, we have found it necessary to fill your position as Lab worker in order to keep our production in process.

Since we have not heard from you since we offered you an alternate position, as an inspector, on your return to work, we can only assume that you are not interested.

Exhibit J to plaintiff's motion for summary judgment. Plaintiff never contradicted the employer's stated assumption that she was bereft of any interest in the inspector's post.

On June 4, 1979, Mario Festa, who had worked as a shipper at TMI since mid-1978, was assigned to Ms. Hosemann's former position in the laboratory. He was selected for that position on the basis of seniority. Ms. Hosemann testified that she would have been willing to go back to the brusher's job, but she kept this thought to herself. Deposition at 82. She told neither Ms. Morrow nor Sigman that she would be willing to accept her former position. She explains this silence as resulting from her belief that the job had already been filled, and "[n]o one was listening to me anyway." Deposition at 82.

Ms. Hosemann contends that between 1977 and 1979, seven male employees and one female employee were allowed to return to work at TMI after periods of disability ranging from three to twenty weeks. She claims that because of her sex, she was not allowed the same privilege.[9] The record indicates, however, that each of these eight employees seasonably informed TMI as to when they would be able to return to work. Answer to Interrogatory No. 13, Exhibit D; Sigman Affidavit at ¶ 9. The record also indicates that one male employee was terminated because of illness, after an absence of one week. Answer to Interrogatory No. 14, Exhibit D. Ms. Hosemann testified that, aside from her termination,

---

6. M. Goose, *Mother Hubbard,* in *Oxford Dictionary of Nursery Rhymes* 317 (I. & P. Opie ed. 1966).

7. Prior to this time, and subsequent to Ms. Morrow's initial telephone call to the plaintiff, the plaintiff had received a telephone call from a co-worker, "Joseph Elly" who told her of shop rumors to the effect that, if she did not come back to work, she would be fired. Deposition at 42. Answer to Interrogatory No. 4, Exhibit D, indicates that Sigman called Ms. Hosemann again on May 29, "but could learn nothing definite from her." *Id.*

8. In an affidavit by Eileen Morrow, dated July 2, 1982 ("Morrow Affidavit"), Ms. Morrow stated that, during this conversation with the plaintiff, Ms. Morrow offered a position as an inspector at no reduction in pay. The plaintiff reiterated, however, that she was not interested in that position. *Id.* at ¶ 5. The defendant's willingness to make available the alternative position, and the plaintiff's consistent lack of interest therein, are undisputed in the record.

9. None of these employees were laboratory workers. Answer to Interrogatory No. 13, Exhibit D.

no other incidents occurred which led her to believe that she was being discriminated against because of her sex. Deposition at 67.

In her complaint, Ms. Hosemann alleged that Sigman's daily telephone calls during her first two weeks of absence from work constituted harassment. No other allegations of harassment are contained in her complaint. In Plaintiff's Answers to Defendant's Interrogatories, filed January 10, 1981 ("Plaintiff's Answers"), however, she described another putative incident of harassment. Apparently, a co-worker at TMI, one Lou Ricci,[10] had left her a note telling her that "everything was okay" and "there were no breaks or anything." Answer to Interrogatory No. 4, Plaintiff's Answers. Ms. Hosemann performed an inspection anyway and "I found two breaks. If I would let them go, the mills would break down and I would get in trouble but he had sent me that note where it said everything was okay." *Id.* Ms. Hosemann testified that this same employee always complained and tried to make her do her work poorly, deposition at 94–95, but that none of her male co-workers ever attempted to touch her against her will or made fun of her because she was a woman. *Id.* at 95.[11]

Plaintiff asserts that the foregoing facts establish a prima facie case of sex discrimination. She further urges that, even if the reasons articulated for her discharge were sufficient to raise the defense of business necessity, the evidence in the record warrants an inference of "pretext". She therefore seeks reinstatement, back pay, compensatory and punitive damages, costs and disbursements, attorneys' fees, and other appropriate relief.

## II. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

In the case at bar, both parties in their cross-motions for summary judgment have proceeded on the same legal theories and on the same material facts. *Schlytter v. Baker,* 580 F.2d 848, 849–850 (5th Cir.1978). They have both urged that summary judgment is appropriate. The Court cannot disagree, even while viewing the record in the light most advantageous to the plaintiff.[12]

---

**10.** The record contains no evidence as to Ricci's position at TMI, but from the context of the incident, one can safely assume that Ricci was simply a co-worker in either the brushroom or the laboratory, and was not plaintiff's superior or supervisor, nor in any way a managing agent of defendant.

**11.** In "Plaintiff's Answers to Defendant's Second Set of Interrogatories," filed October 13, 1981 (approximately one week after her deposition on October 3, 1981), plaintiff identified one incident of "harassment on account of ... sex", not previously mentioned in her complaint, deposition or previous answers to interrogatories. The answer to Interrogatory No. 13 at *id.,* was as follows:

There is one person in the brush room, Anthony Lorenzo, who embarrassed me every work day when I was in days or when he worked overtime on Saturdays, by not talking very good about females. I told John Pereira about it, but I told him I would stick it out. Mrs. Eileen Morrow confronted me with it about a week before I was offered the lab job. She told me that she did not know I

was given a rough time and soon there would be another job open.

Once again, Lorenzo was apparently no more than a co-worker, and whatever had occurred on this occasion was seemingly less than cataclysmic, as Ms. Hosemann stated that she would have been happy to return to the brusher's position after her disability. Deposition at 82.

**12.** Generally, each opposing motion for summary judgment must be viewed independently, as each party may be basing her or its motion on a different legal theory, bottomed on a different set of material facts. *Schlytter v. Baker,* 580 F.2d at 849. In this instant case, however, the parties have agreed to the apposite legal theories and to the pertinent material facts, and the Court has found no material facts in issue, making summary judgment clearly appropriate. *Id.* at 850. Once the Court has formed a tentative mental impression that the defendant's motion should probably be granted and the plaintiff's motion denied, the Court has taken the added precaution of treating the mo-

*Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *Robinson v. Providence College,* No. 78–0327, slip op. at 10 (D.R.I. November 10, 1981); *Minor v. Lakeview Hospital,* 434 F.Supp. 633, 635 (E.D.Wis.1977), *aff'd. mem.,* 582 F.2d 1284 (7th Cir.1978); *Brennan v. Reynolds & Company,* 367 F.Supp. 440, 442 (N.D.Ill. 1973). The undisputed facts demonstrate that, even assuming plaintiff could prove a prima facie case of sex discrimination, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), she has introduced no evidence to show that the non-discriminatory reasons for her discharge proffered by the defendant were pretextual. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). In short, the unadorned facts conclusively demonstrate that the plaintiff has failed to present sufficient evidence to permit a trier of fact to find that defendant discriminated against her on the basis of sex. *See Cartagena v. Secretary of the Navy,* 618 F.2d 130, 137 (1st Cir.1980). Summary judgment for the defendant is therefore appropriate. *Id.*

### III. Proving Sex Discrimination

In *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1817, the Supreme Court established a four-part test which, when met, will serve to create a rebuttable inference of unlawful discrimination by the employer. When adapted to the present case, *id.* at n. 13, 93 S.Ct. at n. 13, the model requires the plaintiff to show that: (i) she is a member of a class protected by 42 U.S.C. § 2000e–2; (ii) she is qualified for a position in the laboratory at TMI; (iii) TMI terminated her employment despite her qualifications; and (iv) after her termination, TMI either allowed the position to remain unfilled or hired a male to fill it. *Id.; Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106, 108 (1st Cir. 1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct.

733, 62 L.Ed.2d 731 (1980); *Robinson v. Providence College, supra,* at 14.

■ Once the plaintiff succeeds in establishing her prima facie case, the burden shifts to the defendant to produce evidence that the plaintiff's employment was terminated for a legitimate, nondiscriminatory reason. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094.

The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. . . . The explanation provided must be legally sufficient to justify a judgment for the defendant. *Id.*

■ If the defendant meets this burden of production, the presumption raised by plaintiff's prima facie case is rebutted. *Id.* at 255, 101 S.Ct. at 1094. Plaintiff, who retains the burden of persuasion throughout, must then demonstrate that the defendant's proffered reason was a pretext for discrimination. *Id.* at 256, 101 S.Ct. at 1095; *McDonnell Douglas Corp. v. Green,* 411 U.S. at 804, 93 S.Ct. at 1825. She may do this "by persuading the court that a discriminatory reason more likely motivated the employer" or "by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. *See Sweeney v. Board of Trustees of Keene State College,* 604 F.2d at 108; *Lamphere v. Brown University,* 491 F.Supp. 232, 234 (D.R.I.1980), *aff'd,* 685 F.2d 743 (1st Cir.1982).

### IV. Application of Law to Facts

■ Let us turn now to the results of the Court's review of the record as a whole, and the Court's application of the legal criteria discussed above to that record. Arguably,

tion for summary judgment as having been raised only by the defendant; and of evaluating

the record in the light most favorable to the plaintiff.

plaintiff has proven her prima facie case.[13] It is unnecessary to decide whether plaintiff succeeded in this initial burden, however, because the undisputed facts in the record clearly demonstrate that TMI discharged plaintiff for a legitimate, non-discriminatory reason. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. The uncontradicted evidence shows that throughout Ms. Hosemann's absence from work, TMI repeatedly attempted to ascertain when she would be able to return. The plaintiff admits that Sigman called her every day during her first two weeks of absence from work to find out when she planned to resume employment at TMI. Ms. Hosemann also admits that after she had been absent from work approximately two weeks, Ms. Morrow telephoned her to find out when she thought she could return to her job. During this conversation, Ms. Hosemann told Ms. Morrow she would visit her doctor soon and would ask him when she would be able to go back to work. Ms. Hosemann admits, however, that she never asked either of her treating physicians when she could return to the laboratory; nor did she call Ms. Morrow with an estimated resumption date, as she had unequivocally promised to do.

Despite Ms. Hosemann's failure to give TMI even the foggiest idea of when she thought she could resume working, the record indicates that TMI continued to hold open her laboratory position for approximately five weeks. One can infer that TMI's decision to do so was at some expense to the efficient operation of the company; the position had been created in the recent past because three persons could not handle the volume of work in the laboratory. Nothing in the record indicates that this need for additional laboratory personnel diminished between April and June of 1979. The number of telephone calls made by Sigman to Ms. Hosemann certainly demonstrates a substantial desire to have the position filled. One can only conclude from the record that TMI went well out of its corporate way to accommodate Ms. Hosemann's disability, and that it was genuinely interested in attempting to enable plaintiff to return to the laboratory or to remain with the firm in another capacity. Yet Ms. Hosemann, for aught that appears, cavalierly disregarded TMI's interests in, and overtures toward, any such accommodation.

It seems eminently reasonable to the Court that an employer may legitimately expect an employee to give an approximate date as to when that employee expects to return to work following a period of disability, even if the return date needs to be revised as the period of disability continues or as the employee's prognosis changes. It is just as reasonable to expect the affected employee to make some effort to supply the employer with such information: Ms. Hosemann made none. It also seems reasonable that, given a business need for additional personnel in the laboratory, TMI would be eager to fill the vacancy in the laboratory created by Ms. Hosemann's absence. The Court has scant difficulty in concluding, therefore, that TMI has amply met its burden of producing evidence which constitutes an articulated showing that it terminated plaintiff's employment for a legitimate, non-discriminatory reason. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–1095; *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Wright v. Southwest Bank,* 648 F.2d 266 (5th Cir. 1981); *Wooten v. New York Telephone Co.,* 485 F.Supp. 748, 761 (S.D.N.Y.1980); *Robinson v. Providence College, supra,* at 16.

---

**13.** Plaintiff is, by virtue of her sex, a member of a class protected by 42 U.S.C. § 2000e–2. Because she was transferred to the laboratory position, one can assume she then fulfilled the qualifications for that position. TMI subsequently terminated the plaintiff and simultaneously filled the vacancy so created with a male employee. In this sense, a prima facie showing may exist. Nevertheless, one could argue with considerable persuasive force that, given plaintiff's injuries and the uncertainty of when she might be able to resume her work, she was not at the time of her discharge qualified to perform the functions required in the laboratory. For the reasons hereinafter set forth, however, the Court need not confront this issue squarely, and the balance of this opinion assumes, arguendo, that plaintiff has surmounted this obstacle.

Finally, it cannot be gainsaid that Ms. Hosemann has offered no evidence from which an inference of pretext can rationally be drawn. Indeed, the plaintiff's arguments of pretext etiolate under the microscope of sweet reason. As previously indicated, the undisputed facts demonstrate that TMI genuinely attempted to accommodate Ms. Hosemann's disability. Although Sigman told Ms. Hosemann that TMI would have to replace her in the laboratory because she could not (or would not) specify even an approximate return date, he offered her another position which was higher-paying. Yet Ms. Hosemann did not even bother to ask what the proffered position paid or the kind of work it involved, even though she was given numerous opportunities to do so. Sigman's daily telephone calls, and Mr. Morrow's inquiry, can only be viewed, based on the present record, as authentic attempts to plan for TMI's need to have certain positions staffed, while attempting withal to accommodate the affected employee.

Most importantly, nothing in the record indicates that Ms. Hosemann was treated differently than similarly situated male employees at TMI. It is undisputed that each of the eight employees (including one female employee) who were allowed to return to their old positions, or were transferred to different ones within the company, after sick-leave absences, gave TMI timely and adequate notice of his or her anticipated return date, something Ms. Hosemann failed, or refused, to do.[14]

Ms. Hosemann's bald allegations of "harassment" are insufficient to overcome the evidence demonstrating that her discharge was for an articulated, legitimate, non-discriminatory purpose. Any such "harassment" must be made with a "discriminatory animus" if it is to be evidence of a pretext. See Texas Department of Community Affairs v. Burdine, 450 U.S. at 256, 101 S.Ct. at 1095; Robinson v. Providence College, supra, at 16. Here, Ms. Ho-

semann has admitted that she was not "harassed" because she was a woman. Deposition at 67, 95. She has therefore recognized that the defendant has exhibited no "discriminatory animus" in the present case. Moreover, the Court finds it impossible to conclude that plaintiff was "harassed" at all. Sigman's daily telephone calls certainly cannot be viewed as constituting "harassment." Rather, the telephone calls indicate that TMI was genuinely concerned with learning when plaintiff could be expected to resume work and with accommodating the plaintiff. Under the plaintiff's faulty reasoning, Sigman would be trapped between Scylla and Charybdis: if he called her, he was "harassing" her, and if he failed to call her, he would have been accused of wanting to fire her. Likewise, the incident involving plaintiff's co-worker, Lou Ricci, seems, to the Court, to indicate that Ms. Hosemann was a more careful employee than Ricci, not that Ricci was purposefully harassing her.

■ Finally, nothing in the record indicates that plaintiff suffered from sexual harassment as that term has come to be defined in Title VII litigation. For sexual harassment to be recognized in Title VII litigation, the plaintiff generally must show "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" and (i) that "such conduct is made either explicitly or implicitly a term or condition" of employment, (ii) that "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual," or (iii) "such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." 29 C.F.R. § 1604.11(a)(b) (1980). See Barnes v. Costle, 561 F.2d 983 (D.C.Cir.1977); Walter v. KFGO Radio, 518 F.Supp. 1309, 1315 (D.N. D.1981). While the incident described in footnote 11 may indicate "verbal conduct of

---

**14.** Moreover, the record also shows that one male employee was discharged after he had been absent for one week because of illness.

Nothing in the record, however, indicates whether this employee gave notice of an estimated return date.

a sexual nature" by a male co-worker, nothing in the record indicates that such conduct was a term or condition of plaintiff's employment nor that it substantially interfered with plaintiff's work performance. Indeed, it is apparent from Ms. Hosemann's description of the incident that defendant was concerned about the conduct and alleviated it by transferring Ms. Hosemann to the laboratory. *See Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d 1044, 1046 (3d Cir.1977); *Walter v. KFGO Radio,* 518 F.Supp. at 1315.

### V. Conclusion

Gender-based discrimination has historically been—and regrettably, still remains—a matter of real concern in the economic marketplace. Title VII represents a meritorious legislative initiative designed to address this vexing problem. Yet care must be taken to insure that the statute does not become a cloak which is nonchalantly spread across the record in every instance wherein an employee is involuntarily terminated and replaced by one of contrary gender. Title VII is an avenging sword to be wielded to strike down sexually-oriented discrimination; it is not, and must not be allowed to become, a gun to be held to the temple of an employer whose legitimate, non-discriminatory business needs compel the making of personnel changes or the exercise of prudent, fair-minded business judgments without regard to whether the affected employees are male, female or neuter. In the instant case, the defendant has presented overwhelming evidence of legitimate, non-discriminatory business needs fully justifying its conduct toward Ms. Hosemann. Conversely, the plaintiff has presented nothing of substance to impugn the defendant's proffered explanation. On the present record, no reasonable person could conclude that the plaintiff was the victim of sex discrimination or any other prohibited practices.[15]

Accordingly, it is hereby

ORDERED:

1. That the plaintiff's motion for summary judgment is denied.

2. That the defendant's motion for summary judgment is granted.

3. That judgment shall enter forthwith for the defendant for costs.

---

15. Plaintiff has also included in her complaint an allegation of a claim based on 42 U.S.C. § 1981. While this has been neither briefed nor argued by the plaintiff, and has perhaps been tacitly conceded, the Court notes that, in any event, this claim must fail, as the record is barren of any suggestion of racial discrimination. *Kermit Construction Corp. v. Banco Creditco y. Ahorro Ponceno,* 547 F.2d 1, 3 (1st Cir.1976); *Turner v. Unification Church,* 473 F.Supp. 367, 372 (D.R.I.1978), *aff'd per curiam,* 602 F.2d 458 (1st Cir.1979).