**Annabelle LIPSETT, Plaintiff,**

**v.**

**Ernesto RIVE–MORA, individually and in his capacity as Director of the Training Program of the San Juan Veterans Administration Hospital; Charles C. Freeman, Center Director of the San Juan Veterans Administration; Harry N. Walters, in his capacity as Administrator of the United States Veterans Administration, Defendants.**

**Civ No. 83–1516CC.**

United States District Court, D. Puerto Rico.

Sept. 16, 1987.

Judith Berkan, Santurce, P.R., Charles S. Hey-Maestre and José Antonio Lugo, Instituto Puertorriqueño Derechos Civiles, Río Piedras, P.R., for plaintiff.

Daniel F. López-Romo, U.S. Atty., Wanda Rubianes-Collazo, Asst. U.S. Atty., Hato Rey, P.R., for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

This is a civil rights action for injunctive, declaratory, and monetary relief filed by a female doctor who alleges that her residency in general surgery at the University of Puerto Rico's (UPR) School of Medicine Residency Training Program (Program) was terminated in violation of her due process and equal protection rights, as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, Title IX of the Education Amendments of 1972, 20 U.S.C. sec. 1681 (Title IX), and multiple local laws she has invoked through pendent jurisdiction.

This complaint was mainly directed against the UPR, the School of Medicine, the Program and their higher ranking officers; the UPR being sued pursuant to Title IX, because of the alleged sexually discriminatory practices at the institution, and the officers in their individual and official capacity through 42 U.S.C. sec. 1983, because of their alleged participation in the violations claimed. A minor portion of the pleadings charged alleged incidents of sexual harassment by Dr. Ernesto Rivé-Mora, a staff surgeon at the Veterans Administration (VA) Hospital, an affiliated hospital where the UPR residents would periodically rotate to perform surgery. Plaintiff sued Dr. Rivé-Mora in his individual and official capacity as Director of the Training

Program of the San Juan Veterans Administration while Charles C. Freeman, Center Director of the San Juan Veterans Administration and Harry N. Walters, Administrator of the United States Veterans Administration, were sued only in their official capacities (the federal defendants).

In *Lipsett v. University of Puerto Rico,* 576 F.Supp. 1217 (D.P.R.1983) (*Lipsett I*), we denied the federal defendants' motion to dismiss based on sovereign immunity because the allegations could support a *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), type of action against Dr. Rivé-Mora. In view of the limited development of the facts at the time, we reserved ruling on whether a Title IX action could be asserted against the Veterans Administration through its higher officials or whether Dr. Rivé-Mora could also be held liable under 42 U.S.C. 1983 based on the acting-in-concert-with-state-officials theory. *Lipsett I* at 1222–24. However, in *Lipsett v. University of Puerto Rico,* 637 F.Supp. 789 (D.P.R.1986) (*Lipsett II*), the motions for summary judgment of the UPR and its officers' were granted and partial judgment entered dismissing all claims against them for failure to establish their liability under Title IX or section 1983 for the alleged due process violations and sexually discriminatory or harassing practices among the residents. The federal defendants had not filed their motion for summary judgment and the claims against them were not considered in *Lipsett II* because of a pending discovery request.

Having ruled on this matter, we now have before us the federal defendants' motion for summary judgment and plaintiff's oppositions and replies, the last of which was filed on May 15, 1987. The essential argument made by the federal defendants is that the conduct charged against Dr. Rivé-Mora does not amount to constitutionally proscribed sexual harassment and that plaintiff was not subjected to any unequal treatment based on sex by any of the remaining defendants. They also contend that the sex harassment and discrimination claims are time barred and that, at least, they are entitled to qualified immunity.

Plaintiff counters that the high ranking Veterans Administration defendants were responsible for the sexually hostile environment at the Program and urges that we adopt an agency type of liability from Title VII of the Civil Rights Act of 1964, as advanced by *Meritor Savings Bank v. Vinson* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). She claims that Dr. Rivé-Mora sexually harassed her by creating a hostile environment through repeated sexual advances and by treating her unfavorably when she rejected these advances and that the claims for the discriminatory practices did not accrue until the decision by the appeals committee was final or, at least, until December 1982, when Dr. Rivé-Mora participated in the faculty meeting that decided not to reconsider their decision.

Before proceeding further, it is important to note that the court has already ruled upon and entered partial judgment on the merits of most of plaintiff's claims. Plaintiff has attempted, in a subtle but deliberate manner, to relitigate many of the same issues already ruled upon in *Lipsett II,* which we make a part of this Opinion and Order. It should also be noted that plaintiff requested reconsideration of the *Lipsett II* Opinion and Order when she read in the newspaper that the Supreme Court had issued the *Meritor Savings Bank v. Vinson* opinion regarding an employer's liability for its supervisor's acts of sexual harassment in a Title VII case. As we stated in our Order of August 21, 1986 denying the motion for reconsideration:

> The *Meritor* decision deals with the particular requirements and scope of liability in a Title VII action. The instant complaint is not based on Title VII and codefendants' liability, as discussed in our Opinion and Order, has been couched otherwise. Moreover, the particular view adopted in Title VII cases as to the employer's liability for acts of its supervisors discussed in *Meritor* did not pop out of the blue. *See Anderson v. Methodist Evangelical Hospital, Inc.,* 464 F.2d 723, 725 (6th Cir.1972) *cited by the Court in Meritor,* [477 U.S. at p. ——, 106 S.Ct. at p. 2408] 54 L.W. at p. 4707,

and cases cited by concurring judges [at p. ——, 106 S.Ct. at pp. 2409–2410] at p. 4708. Plaintiff has offered absolutely no justification for failing to include in her extensive oppositions to the motions for summary judgment an argument for the transposition of the Title VII supervisor-employee liability doctrine, available at the circuit court level way before the *Meritor* opinion was issued, to the particular factual and legal framework of this case. Likewise, she has also failed to request further amendments to her complaint to introduce such grounds for co-defendant's liability. We are not dealing with a pro-se civil rights litigant but with a professional represented by various attorneys associated with an institute which calls itself Instituto Puertorriqueño de Derechos Civiles and which is, presumably, knowledgeable of civil rights' litigation. Finally, plaintiff fails to elaborate in her Rule 60(b)(6) motion just how this special doctrine can be applied successfully to the specific factual framework of this case and to the disarrayed set of events discussed in our Opinion and Order. We see no reason why, at this stage of the proceedings, we should engage *sua sponte* in the complex and novel analysis of how this Title VII doctrine applies to this case when plaintiff herself has not cared to do so.…

We find it necessary to refer to our prior rulings in *Lipsett II* for plaintiff's opposition is plagued by unexplainable repetition of adjudicated issues, as evinced in her statement of facts in controversy and poorly developed arguments which mix concepts from the various civil rights legislations and constitutional principles. In *Lipsett II*, we mentioned the difficulty in assessing plaintiff's claims since their factual basis rested on a "disarrayed group of events covering a three year period and involving a multitude of individuals and situations". Unfortunately that situation still persists as well as a poorly focused application of the pertinent legal principles to the relevant facts. There is no need to reexamine all the issues considered and ruled upon in *Lipsett II*. Suffice it to say that all the factual and legal analysis set forth therein is expressly incorporated and made a part of this opinion.

The facts underlying the parties' positions are derived from the documents and depositions in *Lipsett II*. Aside from these documents, defendants have also included the Veterans Administration Hospital's operations log book, an affidavit by Dr. Rivé-Mora, and resumes of the attendings at the Veterans Administration component of the Program to contest the contention that plaintiff operated less when she rejected Dr. Rivé-Mora's approaches. Plaintiff has also included a sworn statement dated December 1986 where she addresses many of the deficiencies of her case which were previously pointed out by the Court in *Lipsett II* and explains her motivations for the inconsistencies. She also tries to square the case with the *Vinson* decision as to the inexistence of an anti-discrimination policy or grievance procedure, indicating that she was never told in any of her initial orientations at the Program that sex discrimination was disfavored or that she could complain about it. She also adds other incidents of harassment by a senior resident during her first rotation at the V.A. Hospital and of unequal treatment at V.A., which she had never mentioned before. We examine the factual context of this record in light of the principles applicable to motions for summary judgment, as discussed in *Lipsett II* at pp. 798–800. We will first consider the claims against the Veterans Administration's higher ranking officials, Walters and Freeman.

■ Plaintiff sued these two defendants in their official capacity only. She indicates in her brief that she was ordered to join these defendants in their official capacities at the request of the government attorneys representing Dr. Rivé-Mora who indicated at the preliminary injunction hearing in August 1983 that any decision regarding reinstatement pendente lite to the Program could result in the possibility that the Veterans Administration, not a party to the suit at that time, be affected, since reinstatement could entail that plaintiff perform surgery with Veterans Hospital patients. As we explained in *Lipsett I*,

since the Veterans Administration could not be sued *eo nomine,* the claims could be brought against the officers directing the agency. Notwithstanding our apparently mistaken understanding that these parties were only included as a matter of procedure in case plaintiff succeeded in her principal claim and equitable relief indirectly affecting Veterans Administration were needed, plaintiff now argues that these defendants are also responsible for the general sexual harassment prevalent among the residents of the Program. These officials, according to plaintiff, must respond because they are the representatives of the Veterans Administration which is an "educational institution" within the meaning of Title IX. Plaintiff displays the same "amalgamation of sometimes disconnected facts, rumors, perceptions and assumptions ..." *Lipsett II,* plus some new incidents which allegedly occurred at the Veterans Hospital, and concludes that the higher echelon federal defendants are responsible under Title IX for permitting this to go on in their federally funded, educational institution.

However, this last argument which equates the Veterans Administration Hospital to an educational institution is not supported by the record, the law, or plaintiff's prior position. The record and plaintiff's prior arguments point to the UPR as *the* educational institution responsible for the Program. This is the party against which she has always directed the Title IX action. Neither the Veterans Administration, its staff, Walters or Freeman are responsible for the major educational decisions affecting the surgery residents. The Veterans Administration pays for six or seven of the residents' stipend and its staff evaluates the residents, but the final decision on who gets promoted, dismissed, accepted or even assigned to rotate at the Veterans Administration Hospital is made by the UPR Program directors. The entity that awards certificates of completion of the entire five year program or parts thereof is the UPR Program. Plaintiff has not presented a genuine controversy on these facts which are discussed in defendants' depositions. The Veterans Administration

Hospital is affiliated to and considered as a single hospital by the UPR Program, not the other way around. It is clear from the record that the Title IX action was directed at the proper educational institution which was the recipient of federal funds, the U.P.R., and not at the Veterans Administration Hospital which merely permits rotations of the Program's surgery residents through their wards as part of their training at the U.P.R. Program. It is not an independent surgery residency educational program. The Title IX definition of an "educational institution" includes schools, colleges or departments of a larger institution, only if such subdivisions are "administratively separate units," 20 U.S.C., sec. 1681(c). Since we have already determined that no sexual discrimination could be attributed to the U.P.R. Program, plaintiff's arguments on this point are groundless. We consider them as an attempt to challenge our prior ruling of no liability on the part of U.P.R. under Title IX on a new theory which she did not care to expand previously.

■ As an alternative argument, plaintiff suggests that we adopt the agency type of liability ascribed to employers in employment discrimination cases pursuant to Title VII for the sexually discriminating or harassing acts of their supervisors, as discussed in *Meritor Savings Bank v. Vinson.* She has not cited, however, any authority in support of this. Her circular argument in general terms refers to the legislative history and laudable purpose of the Civil Rights Act as indicative that all these laws are part of a single enforcement scheme which should be uniformly applied. Since Title VII is part of this scheme, we should apply the *Vinson* holding to this case. Plaintiff considers that the *Vinson* decision makes it "absolutely clear that traditional civil rights theories involving questions of respondeat superior are not the correct standards to be utilized in addressing this issue in a case involving sexual harassment." She then refers to her civil rights common enforcement scheme theory and concludes that "there is no reason why the case at bar should be viewed different-

ly from a case arising under Title VII." We are left in the dark as to how this agency liability would apply to the particular circumstances of this case, (i.e. whether these defendants would meet the criteria of "agent" of an employer under Title VII, see *Owens v. Rush*, 636 F.2d 283 (10th. Cir.1980)). Even assuming that the alleged conduct amounted to sexual harassment or discrimination with respect to the higher echelon, federal defendants, her arguments are fatally defective. In terms of liability under Title IX, the first practical problem encountered is that the employer-educational institution which supposedly would be liable through agency principles for the acts of its supervisors is the Veterans Administration and not the individual defendants. The remedies available under Title IX, withdrawal of federal funding and injunctive relief, *see* 20 U.S.C. sec. 1682, *North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 536–40, 102 S.Ct. 1912, 1926–28, 72 L.Ed.2d 299 (1982); *Lieberman v. University of Chicago*, 660 F.2d 1185, 1188 (7th Cir.1981) *cert. denied*, 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456, would have to be sought from the V.A. It is not necessary to examine all the intricate dilemmas involved in considering whether Title IX may be applied to a federal agency, a position plaintiff has not even touched upon, since the V.A. Hospital simply is not the pertinent educational institution in this case as that term is defined by Title IX, *See* 20 U.S.C. 1681(c), but rather the U.P.R. Program. Plaintiff did not argue on those grounds when addressing the U.P.R. defendant, and she has not cited a single case holding contrary to our conclusion in *Lipsett II*, at p. 801, that principles of respondeat superior are ill suited for Title IX cases in situations such as the present one. The same conclusion would hold even true for the higher echelon V.A. defendants, given their very limited contact and their distance from the alleged hostile setting and the failure of plaintiff to raise before them a grievance or complaint that she was being subjected to sexual harassment or discrimination at the V.A. Hospital.

In terms of the 1983 or *Bivens* action against these defendants [1] we reject plaintiff's conclusion that no reasons exist to preclude the application of the principles of agency liability of Title VII to this case. Neither the Supreme Court nor the First Circuit have abandoned the position that principles of respondeat superior are not applicable in section 1983 cases. In the circumstances of this case, a particular defendant's personal involvement would have been established under any one of the theories set forth in Lipsett II, at pp. 800–801. Furthermore, even though Title VII and section 1983 or *Bivens* suits may overlap in many situations, for instance, racial or sexual discrimination, they are differences which Congress and federal courts have distinguished. Title VII is designed to curtail discrimination in employment through an elaborate set of administrative procedures carried out by the Equal Employment Opportunity Commission (E.E.O.C.), which must be followed before filing suit and which include attempts at conciliation. *See Great Am. Federal S. & L. Ass'n v. Novotny*, 442 U.S. 366, 373–377, 99 S.Ct. 2345, 2349–2351, 60 L.Ed.2d 957 (1979). This legislation and its detailed administrative procedures are geared to provide an opportunity for a non-judicial and non-adversary resolution of claims. *Id.* at 372, 99 S.Ct. at 2349. It is only when these procedures are exhausted and the E.E.O.C. gives the claimant a right to sue letter that a judicial action may be commenced, and then only if the action is filed within a short time period provided by the statute. *Id.* at 373, n. 13 and 374, n. 14, 99 S.Ct. at 2349, n. 13 and 2350, n. 14. Actions under Title VII are brought against the *employer*, not against the supervisor or employees who harassed or discriminated, although, according to the E.E.O.C. Guidelines and the Supreme Court's decision in *Vinson*, the employer may be held liable for acts of its supervisors under principles of agency. *Vinson*, 106 S.Ct. at 2408–09. Violations to Title VII may be proven without showing an intent to discriminate but they are

---

1. Plaintiff argues they may be found liable on both grounds, although there is not a shred of

evidence that they acted in concert with the state defendants to deprive her of her rights.

tried without a jury and the relief is limited to reinstatement and two years backpay. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Novotny,* 442 U.S. 374–375, 99 S.Ct. 2350. Congress also expressly abrogated state sovereign immunity for claims under Title VII special provisions for state employees. *See Quern v. Jordan,* 440 U.S. 332, 344, 99 S.Ct. 1139, 1147, 59 L.Ed.2d 358 (1979).

In contrast to this specialized legislation, section 1983 is not a statute with any substantive content but merely the conduit through which individuals may obtain redress for violations to rights protected by the federal constitution or by federal law. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 616–18, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979). Although constitutional violations actionable under 1983 are not limited to the workplace, plaintiff must establish that the "violator" who may not be the state, *See Quern,* 440 U.S. 332, 99 S.Ct. 1139, was acting under color of law, with adequate state action, and that there was sufficient injury to a constitutionally protected right, as well as a causal relationship between the alleged wrongful act and the injury suffered. *See gen. Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), *Landrigan v. City of Warwick,* 628 F.2d 736 (1st. Cir.1980). An important additional distinction is that Section 1983 actions based on violations to the Equal Protection Clause must show that the defendant intentionally discriminated against plaintiff because of membership in a protected class. *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). *Personnel Administrator v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). These differences have moved courts to recognize that these are separate actions and to permit their simultaneous consideration if the facts alleged give rise to violations of both the equal protection clause and Title VII. *See Huebschen v. Department of Health and Social Services,* 716 F.2d 1167, 1171 (7th. Cir.1983). (With the exception of federal employees who may not bring *Bivens* suits for discrimination in federal employment because the Court held in *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed. 2d 402 (1976) that Congress created an exclusive, pre-emptive remedy in Title VII's 1972 amendments for such actions.) However, this advantage of having two grounds for recovery has a significant limitation: section 1983 may not be used to sustain an action for violation to Title VII only. *See Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1204 (6th Cir.1984). The reason for this is obvious. If violations to Title VII were allowed to proceed through 1983 actions, the statutory and administrative design enacted by Congress for Title VII actions would be easily circumvented. *Cf. Novotny,* 442 U.S. at 375–76, 99 S.Ct. at 2350 (Section 1985 action for employment discrimination would completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII). *See Alexander v. Chicago Park Dist.,* 773 F.2d 850, 855 (7th Cir.1985), *Day,* 749 F.2d at 1204; *Tafoya v. Adams,* 612 F.Supp. 1097 *and cases cited at pp. 1099–1103* (D.Colo.1985).

In the present case, plaintiff has never channelled her claim under Title VII. She has never filed an administrative proceeding with the E.E.O.C. nor does the case meet many of Title VII statutory requirements. Her reliance on the *Vinson* holding as to agency principles is misplaced. In *Vinson* the Court was clearly concerned with the workings of Title VII and relied heavily on the E.E.O.C.'s Guidelines which indicated that liability could be established in this manner. *Id.* at 106 S.Ct. 2408. Plaintiff's general reference to the common goals of civil rights legislation does not take into account the differences that Congress and the courts have established for each of these pieces of legislation. Moreover, it is not this court's task to carve additional substantive constitutional rights in the name of a particular philosophical

view of what should be the scope of the equal protection clause. *See San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). In sum, even assuming that part of the factual content of the record dealing with the V.A. Hospital showed some sort of violation to the Constitution actionable under either *Bivens* or section 1983, there is no authority to hold that these two V.A. defendants are liable for these acts merely on agency or respondeat superior principles. The weakness of plaintiff's arguments against the two federal defendants tends to show that her true target has always been the U.P.R. Program and the U.P.R. defendants.

We now reach the original claims made against Dr. Rivé-Mora. Initially plaintiff's claim against him was for sexual harassment, limited to his alleged sexual advances during her first rotation through the V.A. Hospital during November and December of 1980, and some vaguely described rejection for not operating as much with him during her second rotation. She now expands her claims alleging that, besides sexually harassing and treating her less favorably when she rejected his advances, he also discriminated when he requested that the V.A. senior residents who complained about her during her second rotation state their complaints in writing and in later submitting these reports to the Program's higher authority without letting her tell him her story at his office. She claims this was not the usual procedure and was not required of her when she complained of her senior resident's unjust treatment during her first rotation. In addition, she contends that Dr. Rivé-Mora continued to discriminate against her by participating in the December 1982 faculty meeting and making a "veiled threat" that he would not allow plaintiff to rotate through V.A. She concludes that this swayed the faculty to vote against reconsidering its prior decision to terminate her from the Program after completion of her third year of residency. She claims that these acts, motivated by discrimination against her, tainted the procedure which resulted in the decision to terminate her residency. As to the sexual harassment,

she argues that, according to Title VII caselaw on harassment, there are two modalities which may be actionable; (1) the quid pro quo form which entails the conditioning of job benefits to submitting to sexual advances, and, (2) the creation of a sexually harassing and hostile work environment despite the absence of any loss of tangible job benefits. Plaintiff claims the record shows that both modalities were present at the V.A. Hospital for Dr. Rivé-Mora allowed her to operate more when she responded to his advances but restricted her operations when she rejected him and that his sexual advances and commentaries, as well as those of the staff and residents at the V.A. Hospital, created a sexually hostile work environment.

According to plaintiff's sworn statements and depositions, it was during her first year of residency (July 1980–June 1981) that she made her first rotation through the V.A. Hospital. She was assigned to Ward B for the two months of her rotation, November and December 1980. The senior resident at this ward was Dr. Novoa. Dr. Rivé-Mora was one of the attendings covering the ward. Plaintiff contends that Dr. Rivé-Mora would often make comments which she considered had sexual overtones. Specifically, she remembers he once told her that movie actress Bo Derek was nothing compared to her and that she looked better with her hair straight. On another occasion, Dr. Rivé-Mora took her hands and told her not to bite her nails. During surgery, Dr. Rivé-Mora liked to listen to old romantic popular music he had taped and once mentioned in front of the operating team that he would like to be listening to that music with someone at the beach. She adds in her December 1986 sworn statement that Dr. Rivé-Mora would comment to residents about what he liked or disliked about females; specifically she mentions that he indicated "at various times that he preferred women who were feminine and gentle, but under that cover were cat-like (feline)." He also told her that he liked the way she dressed because she dressed like a woman doctor ("como una doctora"). Plaintiff stated that

she had heard from many people, not identified, that Dr. Rivé-Mora had a reputation for being a womanizer and that the residents would comment that he liked to pick the tallest and best looking women residents for his ward. Specifically, she refers to the head nurse of the Surgery Intensive Care Unit at the V.A. Hospital who "constantly made fun of me because since I had heavy legs she knew Dr. Rivé-Mora was 'googy-eyed' with them and wanted me sexually." On another occasion she claims a female V.A. nurse told her to stand at a certain point so that Dr. Rivé-Mora could get a good look at her legs. Dr. Lipsett admitted, however, that she responded nicely to Rivé-Mora's remarks by smiling back when he made them.

In support of the "hostile environment" claim she raises for the first time in her December 1986 affidavit that Dr. Novoa, the senior resident at the ward, humiliated her during her first rotation by making vulgar comments about women in front of patients. Specifically, she refers to Dr. Novoa once commenting in her presence and before six male patients how he would like to have sex with a nurse who passed by. She also states that when she performed a sigmoidoscopy, Dr. Novoa would tell the patient that Dr. Lipsett was going to give him pleasure while he would explain the procedure in professional manner using correct medical terms if a male resident performed it. Plaintiff also indicated that Dr. Novoa would assign her to menial and unnecessary tasks and would often mention that women were not fit to be surgeons, stating that women could not be relied on when they were menstruating or, as he said, "in heat." Plaintiff has never alleged that she complained to any Program official while rotating at V.A. for the first time about any of this vulgarity or of any incidents constituting sexually harassing conduct. It has never been alleged that she confronted this same type of vulgar, sexually charged, and derogatory comments during her second rotation at V.A.

As to specific incidents which she considers sexually harassing during this first rotation, she mentions that on "various occasions" Dr. Rivé-Mora would call her on the phone at her resting room at the V.A. Hospital when she was the resident on duty. He would ask her what she was doing, whether she was alone, whether she felt alone and then he would ask her to come down from her room to the emergency ward or to the hospital's lobby. Finally, one night as she was leaving she met Dr. Rivé-Mora at the V.A. Hospital's parking lot. He told her he was not seeing her operate that much with him and asked what she was doing. She explained that Dr. Novoa, her senior resident, was not assigning her that many operations and would give her non-operating and menial tasks. He indicated he would talk to Dr. Novoa about it and asked whether she liked to perform any particular surgery. He indicated he would arrange for her to operate more. He then alluded to her legs and hair, asked if she had an automobile, if she wanted a ride, what she did after leaving the hospital, and if she wanted to go somewhere for a drink. She does not mention whether she accepted Dr. Rivé-Mora's invitation, but, presumably, did not because she admitted she never engaged in any type of sexual activity with Dr. Rivé-Mora and she further stated that she believed that this invitation would, if accepted, invariably lead to having sexual intercourse with Rivé-Mora on that same night. She believes she operated much more during this rotation. She stated that Dr. Rivé-Mora never asked her to have sex and she has not charged that he ever asked her for sexual favors in return for privileges or educational benefits.

There is no allegation that Dr. Rivé-Mora's alleged advances somehow persisted after she finished her first rotation through Veterans Administration, sometime in late December. More than a year later, from January to June 1982, when she was on her second rotation through the V.A. Hospital, she was assigned for one month to Dr. Rivé-Mora's ward and again he allegedly made some comments about her looks. She does not specify what comments he made during this second encounter, but presumably they were of the same nature as the previous ones. This time,

however, plaintiff was not "nice" to Dr. Rivé-Mora and would not smile back. Instead she gave him disapproving looks or turned away. Plaintiff contends that because of this rejection, his attitude toward her changed dramatically. She contends that she operated less, that during the last part of her rotation he treated her unequally because he asked the complaining senior residents to put their complaints against her in writing while he did not request this when she complained to him about Dr. Novoa, and and that he forwarded these complaints to the Program's authorities without first meeting with her to listen to her side of the story. She states that some people had told her Dr. Rivé-Mora was "hostile" to her. She understands this was confirmed by his participation in the December 1982 meeting where he made a "veiled threat" to the UPR faculty by opposing her rotation at V.A. during her last probation term, swaying the faculty to vote against reconsidering their July decision not to promote her to the fourth year of residency. Although plaintiff admits she never said a word to the V.A. Hospital attendings or Program's faculty of this "harassment" and that she never questioned Dr. Rivé-Mora's participation at the December 1982 meeting, even though she did question Dr. Novoa's presence at that meeting as well as Dr. Mas' at the appeals committee, she claims nobody told her she could and she thought it a better strategy not to question Dr. Rivé-Mora's presence at the December 1982 faculty meeting.

 That discrimination may be actionable, under both *Bivens* and section 1983, as a violation to the Equal Protection Clause was clearly established in *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), where the Court indicated that there was a federal constitutional right (under the equal protection component of the Due Process Clause) to be free from gender discrimination which could not be shown to serve important governmental objectives and which was not substantially related to the achievement of those objectives. *Id.* at 234–35, 99 S.Ct. at 2271. However, neither the Supreme Court nor the First Circuit have ruled that sex

harassment may constitute a form of sex discrimination in violation of the Equal Protection Clause. The sex harassment claim is really a creature of Title VII caselaw. Its origins are generally traced to several cases from the District of Columbia which considered that sexual harassment, although not specifically prohibited by the statute, was nonetheless a form of discrimination which the statute intended to curtail. *See e.g., Williams v. Saxbe*, 413 F.Supp. 654 (D.D.C.1976), *rev'd. on other grounds sub nom., William v. Bell*, 587 F.2d 1240 (D.C.Cir.1978), *on remand, Williams v. Civiletti*, 487 F.Supp. 1387 (D.D.C.1980). The E.E.O.C. followed with the adoption in 1980 of the Guidelines which provide:

> "Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, constitute sexual harassment when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment /or/, (2) submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual".

29 C.F.R., sec. 1604.11. Interpreting these guidelines and analogizing them to cases of harassment in the workplace on account of race, *see e.g., Rogers v. E.E.O.C.*, 454 F.2d 234 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), courts later found that mere sex harassment environment cases where, contrary to sexual favors or quip pro quo cases no tangible loss of a job benefit is evident, could be actionable under Title VII because they affected the conditions of employment. *See, e.g. Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir.1982). As developed by Title VII caselaw, the requirements for this cause of action are that the employee belong to a protected group, that the employee be subject to unwelcome sexual harassment, that the harassment complained of be on account of sex, that the harassment complained of affect a term, condition, or privilege of employment-being

included within said terms, the right to a harassment-free work environment-and respondeat superior. *Henson* at 903. However, courts have consistently held that the harassment must reach a certain level of severity which affects the employee's psychological well-being before it may be considered actionable for Title VII does not create a claim of sex harassment for each and every crude joke or sexually explicit remark made on the job, *Downes v. F.A.A.*, 775 F.2d 288, 293 (Fed.Cir.1985); nor for "every sexual innuendo or flirtation", *Ferguson v. E.I. du Pont de Nemours and Co., Inc.*, 560 F.Supp. 1172, 97–98 (D.Del. 1983); nor for "trivial or merely annoying vulgarity", *Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419, 433 (D.Mich.1984) *aff'd.*, 805 F.2d 611 (6th Cir.1986); nor isolated incidents and occasional use of offensive language as part of casual conversation in the workplace, *Volk v. Coler*, 638 F.Supp. 1555, 1558–59 (C.D.Ill.1986). Title VII may not be used as a vehicle to vindicate the "petty slights of the hypersensitive", *Zabkowicz v. West Bend Co.*, 589 F.Supp. 780, 784 (D.Wis.1984). As indicated by the Supreme Court in *Vinson*,

"For sexual harassment to be actionable it must be sufficiently severe or pervasive 'to alter the conditions of /the victim's/ employment and create an abusive working environment'"

*id.*, 106 S.Ct. 2406. *See also, Downes v. F.A.A.* 775 F.2d at 293, *accord. Moylan v. Maries County*, 792 F.2d 746, 749–50 (8th Cir.1986); *Scott v. Sears Roebuck and Co.*, 605 F.Supp. 1047 (D.Ill.1985), *aff'd.* 798 F.2d 210 (7th Cir.1986). Whether the sexual harassment alleged is sufficiently pervasive or severe is a circumstantial assessment made according to an objective standard of what would a reasonable woman's reaction to a similar environment would be, not on what particular feelings were aroused in a given plaintiff, *Highlander v. K.F.C. Nat. Management Co.*, 805 F.2d 644, 650 (6th Cir.1986). Most cases that have found the presence, or possible presence, of a hostile environment actionable as sexual harassment, have involved situations of marked hostility and abuse of a clearly exploitative or humiliating nature because of the victim's membership in a protected group. *See, Vinson* 106 S.Ct. 2399 (repeated sexual demands, intercourse 40 or 50 times); *Moylan* 792 F.2d 746 (rape); *Egger v. Local 276, Plumbers & Pipefitters Union*, 644 F.Supp. 795, 797 (D.Mass.1986) (physical contact, threats, demeaning pranks and comments on plaintiff's chest size, about her sex life, graphic description of male employees' sex life in front of her, showing plaintiff pornographic books and asking her to participate in a sexually explicit home video.); *Moffett v. Gene B. Glick Co., Inc.*, 621 F.Supp. 244, 270 (N.D.Ind.1985) ("Regular, almost daily exposure to terms such as 'stupid cunt' 'whore', 'bitch' and 'nigger lover' over the course of six to seven months"); *Berkman v. City of New York*, 580 F.Supp. 226, 230–32, 240 (E.D.N.Y.1983), (unimpeded hazing of women firefighters by other male employees, graffiti and cartoons making blatant sexual mockeries of plaintiffs, placing of prophylactic devices and wet vibrators in one of plaintiff's beds, stealing their work instruments, breaking their equipment, exclusion from meals and touching of buttocks, breasts, waist and hair on various occasions).

With respect to the requirements of the *quid pro quo* type of sex harassment claim, the Supreme Court indicated that the main inquiry was whether plaintiff, by her conduct, indicated that the alleged sexual advances were "unwelcome." *Vinson*, 106 S.Ct. at 2406. Of course, this type of claim requires a showing that the job benefits were in fact being conditioned upon sexual favors. *Hosemann v. Technical Materials, Inc.*, 554 F.Supp. 659, 666–7 (D.R.I.1982); *Reichman v. Bureau of Affirmative Action*, 536 F.Supp. 1149, 1177 (M.D.Penn.1982). In addition to being unwelcome, some cases have distinguished situations where the advances are the result of a personal, romantic attraction of a supervisor to a particular employee from those situations where the sexual demands are merely the result of discriminatory and exploitative attitudes based on sex, forced upon the employee because of the supervisor's power over employment conditions.

*See, DeCintio v. Westchester County Medical,* 807 F.2d 304, 307–8 (2nd Cir.1986) (supervisor's preference of candidate for position over other candidate because of a romantic affair with the selected candidate was not discrimination based on sex).

Notwithstanding the Supreme Court's silence on this matter, a growing body of cases have relied on this Title VII sex harassment caselaw to recognize that sex harassment may constitute a violation to the Equal Protection Clause actionable under section 1983. *See Bohen v. City of east Chicago, Ind.,* 799 F.2d 1180, 1185 (7th. Cir.1986) *and cases cited therein.* In so doing, courts have borrowed extensively from Title VII harassment caselaw to draw the conceptual framework for this constitutional action. *Id.* The requirement that the harassment be of a certain degree of severity as explained by these cases for instance, *id.* at 1186, or that it be *because* of sex and not due to some particular romantic attraction to a given person, *id.* at 1187 and *Volk v. Coler,* 638 F.Supp. 1540, 1554 (C.D.Ill.1986), *Strama v. City of Chicago,* 617 F.Supp. 422, 426 (N.D.Ill.1985) have been assimilated to the equal protection, sex harassment claim. Although being an action under the constitution, the particular requirements for such types of section 1983 claims, i.e. state action, constitutional injury, causation, would also apply. *See, Day,* 749 F.2d at 1204. In addition, section 1983's different statute of limitations, in this case, one year *see, Fernández v. Chardon,* 681 F.2d 42, 48 (1st Cir.1982), applies.

In the present case, plaintiff's scenario of sex harassment at the V.A. Hospital reflects the possibility of both modalities, each relying partially on the same set of facts for support, i.e., Dr. Rivé-Mora's advances which allegedly contributed to the "hostile environment" and which also form part of the elements of the quid pro quo claim. We have examined the factual context of the record with great difficulty due to plaintiff's constant injection of subjective characterizations of the limited facts she has presented. We conclude that the factual basis is sufficient to support any of these two modalities and that the contro-

versies of material facts raised by plaintiff regarding these claims are not genuine. They rely more on her perceptions, self-contradictions, conclusions and unsupported expectations than on the raw factual data revealed by the record and the inferences that can reasonably be derived. *See, Lipsett II* at pp. 798–799, *and see also Anderson v. Liberty Lobby, Inc.,* 477 U.S., 106 S.Ct. 2505, 2510–2512, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986).

■ Neither one of the two core elements for the quid pro quo modality of harassment, demands for sexual favors and conditioning of job benefits upon submission to sexual favors, were shown to have been present in Dr. Rivé-Mora's conduct, even assuming they occurred as plaintiff claims. Plaintiff never established that Dr. Rivé-Mora demanded, explicitly or implicitly, that she submit to sexual acts. The alleged flirtations could perhaps have been the prelude to such an invitation, as plaintiff "sensed" they were, but the truth of the matter is that they never developed into anything which could be construed as such, except in plaintiff's mind. There is simply no evidence that these "advances" or flirtations ever developed into sexual demands. Additional facts showing that these casual approaches led to some sexual encounter between them would be needed, before it could reasonably be concluded that the contours of a judicially cognizable quid pro quo claim are present. Furthermore, given plaintiff's admittedly favorable responses to these flattering comments there was no way anyone could consider them as "unwelcome." A genuine controversy on such an essential aspect of sex harassment constitutional claim cannot be established merely on plaintiff's belief that sometime in the near future a forced sexual encounter with Dr. Rivé-Mora was bound to occur and because she "sensed" she had to smile back in order to operate more. To permit a quid pro quo sex harassment claim on a speculative basis such as this would come close to judicial blackmail for claims of this nature could never be dis-

missed summarily and defendant would in all probability settle the case rather than submit to the aggravation that a public trial on such sensitive and private matters would undoubtedly cause.

Furthermore, the second important element of plaintiff's quid pro quo claim, the conditioning of a "job," in this case, of an educational benefit, to the sexual demand also has no factual support. The claim that plaintiff operated less after she stopped responding with smiles to Dr. Rivé-Mora's remarks is not supported by the "hard" facts in the record. The V.A. Hospital's operations log book for the two periods during which she rotated through Dr. Rivé-Mora's ward does not show any significant statistical differences between these two rotations regarding the number of operations or the type of operation she performed. During her first rotation through Dr. Rivé-Mora's Ward B, November and December 1980, she operated twenty-one times which averages about 10.5 operations per month. During her second rotation through Ward B, April 1982, she operated fourteen times, this was more than the monthly average of what she operated during her first two month rotation and the same number of operations that the male resident of her same level performed at Ward B during April 1982. During her first rotation, she operated with Dr. Rivé-Mora—she as surgeon, he as assistant—on four occasions, whereas she operated five times with the other attending at Ward B, Dr. Marin-Cancel. During her second rotation through Ward B, she operated with Dr. Rivé-Mora only once. However, so did the other second year male resident for Dr. Rivé-Mora only participated in three operations during this period: one on April 7 in which he participated as surgeon assisted by Dr. Lugo, the senior resident of the ward; one on April 13 in which he assisted Dr. Lipsett in the excision of a neck mass, and another on April 21 when he assisted Dr. Quevedo, the other second year male resident, in a sigmoidectomy. The type of operations Dr. Lipsett performed during both rotations were the usual "lumps and bumps" excisions handled with local anesthesia and the frequently referred amputations, wound debridements, cholecystectomies, herniorrhaphies, hemorrhoidectomies, appendectomies, etc., that were generally performed by first and second year residents indiscriminately, as indicated by the Program directors, and depending on availability of cases. There is no perceivable difference in the type of operations she performed during her first or second rotation through V.A. Hospital. In addition, it is important to note that the record shows that it was not the attending who was in charge of assigning the operations but the senior resident at the ward who determined which operations would be conducted by a given resident. If Dr. Rivé-Mora really told plaintiff he was not interested in operating with her anymore, this was immaterial for she could continue operating with the other attendings or with the senior resident who assigned her to the operations. She has never alleged that operating with Dr. Rivé-Mora was a better educational experience than operating with the other attendings at Ward B with whom she operated a lot. Her contention that Dr. Rivé-Mora's change of attitude, resulting in less participation in operations, took place at the end of her second rotation is also at odds with the record. During this five month rotation she only rotated once through Ward B in April. There is no indication at all as to how Dr. Rivé-Mora could have interfered with her "educational benefit" of operating sufficiently while she rotated through other wards where he was not even an attending, even assuming such reduction were shown. In addition, her own version of the facts also contradicts her theory for the incident where she was approached by Dr. Rivé-Mora at the parking lot and she declined his invitation for a ride and/or a drink—the only indication in the record of a clear rejection occurred during her first rotation when supposedly she operated more. Her position on other aspects of her claim reveals that there were also many other factors, some of her own doing, for any minor variations in the number of operations. She indicated that the trouble with the senior residents who complained of her during her second, probationary rotation through V.A. was due to her "aggressive"

tactics of assigning more patients to the ward she was rotating thru without their permission so that she could operate more. This was later noticed by the residents because the number of operations increased when she rotated through Ward A, a ward which generally had less operations. It was during these last two months, when she rotated through Ward A, not Dr. Rivé-Mora's ward, that the problem with the senior residents surfaced. Furthermore, plaintiff has not explained how performing two or three more operations per month would significantly affect her education. She has never indicated whether the operations she was allegedly deprived of were required to complete or attain a certain level of her training. Although she has never alleged unequal treatment in terms of her evaluations at V.A., a review of the attendings' evaluations during both periods shows no significant difference. Aside from her personality problems which were manifested in her *first* rotation through V.A., there is no reference to any deficiency due to failure to participate in operations.

Finally, her contention that Dr. Rivé-Mora treated her unfairly when he requested that the senior residents state their complaints against her in writing, by refusing to listen to her side of the story, and by his participation in the December 1982 meeting are immaterial. We have already examined at length the entire procedure leading to her separation from the Program and concluded that plaintiff has shown neither the existence of a sexually discriminatory animus in the procedure or a violation of due process. The effect of Dr. Rivé-Mora's participation in the December 1982 meeting has been characterized by plaintiff as a "veiled threat." It is significant to note, as we did in Lipsett II, that Dr. Zenaida Méndez, plaintiff's friend, was present at that meeting. Despite this, not even the spectre of a genuine doubt was raised by submitting a statement sworn by Dr. Méndez affirming that Dr. Rivé-Mora instigated and convinced the faculty not to reconsider its July decision, a decision in which he did not participate. In Lipsett II, we found that Rivé-Mora's participation did not taint

the process, given the number of persons involved and the many decisions taken at different times which resulted in plaintiff's termination. Any reference to this participation as a separate "injury" is baseless for he was not responsible for plaintiff's termination and the process leading to her termination complied with basic constitutional fairness requirements.

As to the request that the senior residents state their complaints in writing and Dr. Rivé-Mora's refusal to listen to plaintiff's version, we are hard pressed to find unfairness and adversity in this action. If anything, requesting that the complaints be in writing could only have worked to plaintiff's benefit in terms of due process for she could confront concrete complaints which she could refute instead of verbal, easily changed versions. Furthermore, plaintiff has not brought to our attention any *similar* incident to show discriminatory treatment. There is no indication in the record of any other situation as serious as the one presented to Dr. Rivé-Mora where the complaint with informally. As Dr. Rivé-Mora pointed out in his deposition, plaintiff was rotating through V.A. as a result of the U.P.R. Program director's decision to place her on probation in an environment different from the one where she had encountered her first difficulties with senior residents. When complaints again arose while she was on probation precisely because of related incidents, Rivé-Mora understood it would have been imprudent to get involved in a verbal squabble instead of commencing formal proceedings. The other instances when plaintiff went to attendings raising the usual complaints of the junior resident that the seniors were not giving them good cases or assigning them operations cannot be compared with the serious complaints against plaintiff raised by Dr. Orlando Torres and Dr. Cuevas regarding insubordination, unreliance, untruthfulness and derelection of duties toward patients, particularly considering the fact that plaintiff was on probation for incidents showing similar tendencies. These new complaints placed her permanence in the Program at stake.

Likewise, there is no support for the conclusion that Rivé-Mora's request that the complaints be written and their subsequent submission to the Program's directors was the *cause* of plaintiff's termination. Her termination, as we said in *Lipsett II*, was a result of her inability to adapt to the U.P.R. Program's authoritarian system. The fact that Dr. Rivé-Mora requested that the complaining residents put their allegations in writing and later referred these allegations to the appropriate officials is irrelevant for causation purposes, absent some factual allegation and proof that he got together with these residents and instigated them to present false charges against Dr. Lipsett. This, however, has not been shown to be the case. The act of requesting formal complaints and the act of later submitting them were consequences of a process which went beyond Dr. Rivé-Mora and which resulted in a fair proceeding. There is little to support even a preliminary outline of a quid pro quo claim.

■ We now reach the hostile environment modality of the sex harassment claim. Although it is not difficult to understand the psychological intimidation caused by continuous and severe sexual, racial or ethnic harassment which can be construed as a violation of the Equal Protection Clause if certain requirements are met, in the present case, plaintiff's theory is basically flawed. Practically all of the incidents of harassment which allegedly contributed to a hostile environment occurred during her first rotation through V.A. Hospital, as early as November and December 1980. She has never alleged that the incidents at V.A. during her second rotation were of a sexual, vulgar nature as those allegedly encountered during the first rotation. As plaintiff admits, the second rotation encounters were related more to the senior residents' annoyance at her "aggressive, patient-stealing" practices and her habit of on-the-spot questioning of their treatment or diagnosis of patients. This complaint was filed

on June 30, 1983. Plaintiff never referred to these early incidents in any of the opportunities she was given to present her case during the procedure that lead to her separation which lasted more than a year. Any cause of action based on these incidents would be time-barred. *See De-León-Otero v. Rubero,* 820 F.2d 18, 19–20 (1st Cir. 1987).

In addition, these incidents were so trivial and isolated that they cannot lend any support in them for an actionable constitutional wrong. Dr. Rivé-Mora's flattering remarks or "piropos" were neither indecent nor obscene. They portray a treatment based on romantic attraction rather than on a desire to discriminate because of gender and, they were clearly not the demeaning or humiliating type of incident discussed in the caselaw. The remaining incidents involving her senior resident at the time, Dr. Novoa, are also too isolated and infrequent to be considered of sufficient severity or pervasiveness. The fact that she never reported these incidents, although she had ample opportunity to do so,[2] reflects they had little effect on her emotional well being. *See Highlander,* 805 F.2d at 650. In sum, the incidents relevant to her hostile environment theory are far removed in degree and pervasiveness from those considered by courts to constitute sex harassment. Her case appears to be more closely related to the type of environment present in *Scott v. Sears Roebuck and Co.,* 798 F.2d 210 (7th. Cir.1986), where the court affirmed the lower court's summary dismissal of plaintiff's sex harassment claims. In *Scott,* plaintiff, an automobile mechanic employee-trainee, alleged that the senior mechanic assigned to her training harassed her by constantly winking at her, suggesting that she give him a "rubdown", answering to her requests for advice "what will I get for it," inviting her to drinks after job hours, and that she was exposed to constant sexual propositions, invitations, and obscene comments from the rest of the

---

**2.** Plaintiff has never alleged she was denied access to the Program's higher officials and her complaints to Dr. Rivé-Mora about Novoa, as well as those made to other V.A. attendings

during her second rotation were not of sex harassment, but were instead the typical complaints of the junior residents that the seniors were not being fair in their assignment of tasks.

**1204**

mechanics, as well as once being slapped on the buttocks. After examining the depositions, the court found that these incidents did not constitute grounds for a sex harassment claim in either of the two modalities. As the court noted: "Title VII is not clean language act, and it does not require employers to extirpate all signs of centuries-old prejudices." *Scott*, p. 210 n. 2, *citing from Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983).

In the case before us, when the innumerable conclusions, subjective perceptions, rumors, self-contradictions and refinements of prior statements by counsel in their briefs are set aside, the record shows that plaintiff has failed to raise a genuine controversy on any fact material to her remaining sex harassment claim against the V.A. officials and Dr. Rivé-Mora. Again we have been presented with a scenario of sex discrimination painted with very broad strokes that fail to delineate the facts relevant to establish the possibility of judicially cognizable issues. From this almost impenetrable haze, made denser by plaintiff's subjective characterization and rationalization of events, we are asked to find the existence of controversies requiring a jury trial. Although, given the massiveness of the file and the difficulty in examining the evidence, one is tempted to declare the existence of issues of fact and to let a jury wrestle with the case later, we would be abdicating our role and duty under R. 56, Fed.R.Civ.P., if we permitted trial by jury of allegations as sensitive as the present one, merely because a party thrusts upon the court a monumental ensemble of documents and allegations where fact and conclusion swirl intertwined in frenzied pursuit of, at least, a partial judicial victory through sheer confusion, in the hope that defendants, in order to avoid the disturbance of a public trial where this type of insinuation will be thrashed about, will work out some type of settlement.

The federal defendants' motion for summary judgment is hereby **GRANTED.** The complaint against defendants Ernesto Rivé-Mora, Charles C. Freeman and Harry N. Walters is hereby **DISMISSED.** There being no valid federal cause of action, the pendent claims based on state law are also **DISMISSED.** Judgment shall be entered accordingly.

SO ORDERED.